[Cite as *State v. Slaughter*, 2014-Ohio-862.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

LEVI A. SLAUGHTER

      Defendant-Appellant

Appellate Case No.    25215

Trial Court Case No.   2012-CR-233

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of March, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

PETER GALYARDT, Atty. Reg. No. 0085439, Office of the Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

      **{¶ 1}**   Defendant-Appellant, Levi A. Slaughter, appeals from his conviction and

sentence following a jury trial in the Common Pleas Court of Montgomery County, Ohio. Slaughter was convicted on one count of felony murder with the predicate offense of felonious assault, one count of discharging a firearm on or near a prohibited premises, one count of having weapons while under disability, and two firearm specifications. The trial court imposed a prison term of 21 years to life and court costs.

{¶ 2} Slaughter argues that the trial court erred in failing to include the consecutive sentence findings required under R.C. 2929.14(C)(4) in the sentencing entry. He also contends that his felony murder conviction is unconstitutional, because it is based on the predicate offense of felonious assault. In addition, Slaughter claims that the trial court abused its discretion in allowing his girlfriend to testify as a witness of the court solely for impeachment purposes and without showing surprise or affirmative damage as required by Evid.R. 607(A). He further claims that his trial counsel was ineffective in failing to move for a bench trial on the weapons under disability charge before trial commenced. Finally, Slaughter argues that the trial court erred in failing to notify him of the consequences for failing to pay court costs.

{¶ 3} We conclude that Ohio law does not require a sentencing court to include the consecutive-sentence findings required under R.C. 2929.14(C) in sentencing entries. We also conclude that a felony murder conviction based on the predicate offense of felonious assault is not unconstitutional under Ohio law. Ohio does not recognize the independent-felony/merger limitation that requires the underlying felony to be independent of the homicide.

{¶ 4} In addition, the trial court did not abuse its discretion when it permitted Slaughter's girlfriend to testify as a witness of the court. The testimony of Slaughter's girlfriend was beneficial to ascertaining the truth of the matter, and there was an indication that her trial testimony would contradict her prior statements to police. Furthermore, when the court calls a

witness, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness.

{¶ 5} We further conclude that Slaughter's trial counsel was not ineffective, because there is no evidence that Slaughter wanted to waive a jury trial before trial began. Additionally, Slaughter did not demonstrate that there was a reasonable probability that the outcome of trial would have been different had the jury been waived prior to trial.

{¶ 6} Finally, we conclude that the trial court erred in failing to notify Slaughter that he would be required to perform community service if he failed to pay court costs. Former R.C. 2947.23(A)(1) applies to this case and it requires such notification. However, the State has conceded to having the judgment modified in part to eliminate the requirement that Slaughter perform community service if he fails to pay court costs. Accordingly, the judgment will be modified in part to eliminate the community service requirement, and we will affirm the judgment as modified.

## I. Facts and Course of Proceedings

{¶ 7} On February 15, 2012, Levi A. Slaughter was indicted in the Common Pleas Court of Montgomery County, Ohio, on one count of felony murder in violation of R.C. 2903.02(B), an unclassified felony; one count of discharging a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3), a felony of the first degree; one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree; and two firearm specifications. The charges arose from the shooting death of Douglas E. Byrd Jr. Slaughter pled not guilty to the charges, and the matter proceeded to a jury trial.

{¶ 8} During voir dire, the trial court referenced Slaughter's prior juvenile adjudication

for complicity to commit robbery when it read the weapons under disability charge to the jury venire. Shortly thereafter, Slaughter advised the trial court that he wanted to waive his right to a jury trial on the weapons under disability charge. Since the jury had not yet been empaneled and sworn, the trial court permitted the waiver. The remaining charges of felony murder, discharging a firearm on or near a prohibited premises, and the firearm specifications were then tried before the jury. The following facts were elicited at trial.

{¶ 9} During the afternoon of January 17, 2012, Byrd died on Pittsburg Avenue in Harrison Township, Ohio, as the result of gunshot wounds to his forehead, left upper chest, and left hip. Earlier that day, Byrd accompanied his girlfriend to a residence at the corner of Falmouth Avenue and Pittsburg Avenue for purposes of picking up her vehicle. From that residence, Byrd decided to walk to a nearby Sunoco station located at 3900 Salem Avenue. While at Sunoco, Byrd ran into Slaughter, who was pumping gas into a 2005 gray Honda Accord with severe front-end damage. The vehicle belonged to Slaughter's girlfriend, Dominique McCoy, who was with Slaughter at Sunoco. Dominique was sitting in the vehicle's front-passenger seat, and Slaughter's cousin, Darryl Slaughter, was sitting in the backseat.

{¶ 10} When Byrd spotted Slaughter pumping gas, he waved and made contact with him. After a couple of moments, both men got inside the gray Honda. Slaughter got in the driver's seat and Byrd got in the backseat next to Darryl. Sunoco's security cameras captured the encounter between Byrd and Slaughter and showed both men climbing in the damaged Honda. The video also depicted Byrd wearing a maroon jacket and dark pants, and Slaughter wearing a gray hooded sweatshirt and jeans. They left the Sunoco station and began driving toward Pittsburg Avenue. Slaughter turned on Pittsburg Avenue and stopped the vehicle near an Advanced Autoparts store.

{¶ 11}  Lacrisha Gibson, an Advanced Autoparts employee, testified that she was inside a vehicle parked in the Advanced Autoparts parking lot when her attention was drawn to a damaged, gray Honda sitting on Pittsburg Avenue.  She heard arguing coming from inside the vehicle, and she saw a man wearing a maroon jacket exit the vehicle from the backseat.  The man began walking fast down Pittsburg Avenue when Gibson saw a second man exit the gray Honda from the driver's seat.  The second man was wearing jeans and a gray sweatshirt with the hood up.  The man in the gray sweatshirt quickly followed the man in maroon, pulled out a semiautomatic gun, and shot him in the head.  Upon seeing this, Gibson ducked and ran into Advanced Autoparts.  She heard more gunshots once she was inside the store.  When Gibson went back outside, she saw the man in maroon lying on Pittsburg Avenue and she called 9-1-1.

{¶ 12}  Slaughter's cousin, Darryl Slaughter, testified that he was in the gray Honda with Slaughter and Dominique on January 17, 2012.  Darryl claimed that he was riding in the backseat smoking marijuana while Slaughter drove him and Dominique around.  He confirmed that they stopped for gas at the Suncoco station and picked up Byrd in the process.  Darryl did not recognize Byrd or know why he got in the vehicle.  He testified that Slaughter and Byrd spoke with each other inside the vehicle, but that he did not pay attention to their conversation.  However, Darryl heard Byrd ask Slaughter to use his cell phone, which Slaughter allowed.  He also heard Byrd instruct Slaughter where to drive and ask to be dropped off on Pittsburg Avenue.

{¶ 13}  When Slaughter stopped on Pittsburg Avenue, Darryl testified that he saw Byrd get out of the vehicle and walk away.  Shortly thereafter, Slaughter exited the vehicle and ran after Byrd.  Darryl also testified that he saw Slaughter and Byrd struggle with each other for a moment, and then he saw Slaughter shoot Byrd with a semiautomatic gun.  Slaughter then got

back in the car and they fled the scene leaving Byrd lying in the street. When Darryl asked Slaughter what happened, Slaughter said, "you didn't hear what he said, what he was talking about on the phone. Them my nig* * *." Trans. Vol. II, p. 521, ln. 10-12. Two days later, Darryl called the sheriff's office and reported what he saw that afternoon.

{¶ 14} Dominique, who still considers herself Slaughter's girlfriend, testified that Slaughter was driving her and Darryl around in her damaged, gray Honda on January 17, 2012. She stated that she was high and drinking alcohol while riding in the front-passenger seat. At trial, she identified her vehicle in photo stills taken from Sunoco's surveillance video. She also identified Slaughter in the photo stills as the man in the gray hooded sweatshirt and jeans. Dominique confirmed that they picked up a man she did not recognize at the Sunoco station. According to Dominique, the man got in the backseat of the vehicle and directed Slaughter where to drive. She also heard the man tell Slaughter to drop him off on Pittsburg Avenue. She claimed that she did not listen to the rest of their conversation.

{¶ 15} Dominique testified that when they stopped on Pittsburg Avenue, she saw the man get out of the vehicle and walk away. She then saw Slaughter get out of the vehicle, and shortly thereafter, she heard three or four gunshots. A few moments later, Slaughter returned to the vehicle and drove away with her and Darryl. She claimed that she saw "something" in the road, but she would not confirm whether it was the man's body. Trans. Vol. III, p. 655, ln. 12-25. According to Dominique, she and Slaughter did not talk about what happened on Pittsburg Avenue, and she did not learn of Byrd's death until she saw the local news.

{¶ 16} Dominique's trial testimony conflicted with prior statements she made to investigating detectives. On January 18, 2012, she told detectives that when Byrd got out of the car, Slaughter turned to her and Darryl and said "I'm about to rob him." Trans. Vol. III, p. 645,

ln. 3-11. She also told detectives that she saw someone lying in the street after Slaughter returned to the vehicle.

{¶ 17} Dominique was also interviewed in the prosecutor's office on two occasions prior to trial. During these interviews, she made it evident that she was aligned with Slaughter and that she did not want to testify against him. *See* Motion for Court to Take Witness as Its Own (Apr. 19, 2012), Montgomery County Common Pleas Court Case No. 2012-CR-233, Docket No. 32, p. 3. As a result, the State moved the court to call Dominique as a witness under Evid.R. 614(A). Slaughter objected, but the trial court ultimately allowed the State to cross-examine Dominique as a witness of the court.

{¶ 18} The State was also permitted to admit evidence of a March 2012 letter written by Slaughter while he was in jail. Slaughter sent the letter to his uncle, Terrence Poole, who is an inmate at the Correctional Reception Center in Orient, Ohio. After the letter was redacted to omit unfairly prejudicial statements, the trial court allowed it to be read into evidence. The redacted letter states in pertinent part, the following:

> They don't have any evidence but three shell casings, no prints, no gun, none of my clothes, a dead body, one shot in the chest, one shot in the back, one shot in the head. A witness that seen my bitch's car leaving the scene and got the plates.
> A witness statement from my cuz Darryl, Dex's son, saying I did the shit. Yeah, he snitching on me, Bra. Nobody that can point me out as the shooter though but Darryl. I pick [Byrd] up at Sunoco gas station and dropped him off by Advance Auto Parts next to Rally's and he got out of the car. Then I got out of the car and you put the rest together.
> It was only me, Darryl, and my bitch in the car. So no other witnesses was there

to see.  Trans. Vol. IV, p. 966, ln. 19-25; 967, ln. 1-9.

{¶ 19}  In light of the evidence presented at trial, the jury found Slaughter guilty of felony murder, discharging a firearm on or near a prohibited area, and a firearm specification on each count.  The trial court also found Slaughter guilty of having a weapon while under disability.

{¶ 20}  The charges for felony murder and discharging a firearm on or near a prohibited area were merged at sentencing, and Slaughter received 15 years to life in prison.  He was also given three years for the weapons under disability charge and three years for the firearm specifications.  All of his sentences were ordered to run consecutively for a total prison term of 21 years to life.  The trial court's sentencing entry does not state the court's consecutive-sentence findings under R.C. 2929.14(C)(4), but the entry does state that Slaughter's sentences are to be served consecutively.  The trial court also ordered Slaughter to pay court costs, but failed to notify him that he could be ordered to perform community service if he failed to pay.

{¶ 21}  Slaughter appeals from his criminal conviction and sentence.

## II.  Did the Trial Court Err in Failing to Include Its Consecutive-Sentence Findings in the Sentencing Entry?

{¶ 22}  Slaughter's First Assignment of Error states as follows:

THE TRIAL COURT VIOLATED R.C. 2929.14(C)(4) AND CRIM.R. 32(A)(4),

AND ERRED WHEN IT FAILED TO INCLUDE ITS

CONSECUTIVE-SENTENCE FINDINGS IN THE SENTENCING ENTRY.

{¶ 23}  Under this assignment of error, Slaughter argues that the issue of whether R.C.

2929.14(C)(4) and Crim.R. 32(A)(4) require the trial court to include its consecutive-sentence findings in the sentencing entry will be addressed in the near future by the Supreme Court of Ohio in *State v. Bonnell*, Supreme Court Case No. 2013-0167, on appeal from *State v. Bonnell*, 5th Dist. Delaware No. 12CAA030022, 2012-Ohio-5150. *Bonnell* was accepted for appeal by the Supreme Court on April 24, 2013, and oral arguments were held on January 7, 2014. Slaughter asks that we wait to render a decision in this case until after the Supreme Court has ruled on *Bonnell.*

{¶ 24} We note that the defendant in *Bonnell* originally appealed from the trial court's sentence on grounds that the court imposed consecutive sentences without making the findings required by R.C. 2929.14(C)(4). *Id*. at ¶ 5, 12-14. However, the issue of whether the trial court's consecutive-sentence findings must be included in the sentencing entry was not raised by the defendant nor ruled on by the Fifth District. While the defendant requested the Supreme Court to determine whether consecutive-sentence findings must be made in the sentencing entry, we question whether the Supreme Court will address this precise issue given that it was not addressed in the Fifth District's opinion. Therefore, instead of staying this matter for the Supreme Court's decision in *Bonnell*, we will move forward with analyzing whether R.C. 2929.14(C)(4) and Crim.R. 32(A)(4) require trial courts to include consecutive-sentence findings in sentencing entries.

{¶ 25} Pursuant to R.C. 2929.14(C)(4), a sentencing court must make certain findings when imposing consecutive sentences. Specifically, R.C. 2929.14(C)(4) allows for the imposition of consecutive sentences if the trial court determines that: (1) "consecutive service is necessary to protect the public from future crime or to punish the offender;" (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger

the offender poses to the public;" and (3) one or more of the following three findings are satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(C)(4)(a)-(c).

{¶ 26}  Crim.R. 32(A)(4) governs the imposition of consecutive sentences and states in pertinent part that:

Sentences shall be imposed without unnecessary delay.  Pending sentence, the court may commit the defendant or continue to alter the bail.  At the time of imposing sentence, the court shall do all of the following:

   * * *

(4) In serious offenses, state its statutory findings and give reasons supporting those findings, *if appropriate*.  (Emphasis added.)  Crim.R. 32(A)(4).

{¶ 27}    Nothing in the text of R.C. 2929.14(C)(4) or Crim.R. 32(A)(4) suggests that   a

sentencing court is required to state its consecutive-sentence findings in a sentencing entry. There is also no such requirement in R.C. 2929.19(B)(2)(b), which states that:

> [I]f the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:
>
>     \* \* \*
>
> (b) In addition to any other information, include in the sentencing entry the name and section reference to the offenses or offenses, the sentence or sentences imposed and whether the sentence or sentences contain mandatory prison terms, *if sentences are imposed for multiple counts whether the sentences are to be served concurrently or consecutively*, and the name and section reference of any specification or specifications for which sentence is imposed and the sentence or sentences imposed for the specification or specifications; \* \* \*. (Emphasis added.) R.C. 2929.19(B)(2)(b).

{¶ 28} In *State v. Just,* 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, the Ninth District discussed how 2011 Am.Sub.H.B. No. 86 impacted R.C. 2929.19(B)(2), and ultimately eliminated the requirement to include consecutive-sentence findings in sentencing entries. *Just* states that:

> Although [in 2011 Am.Sub.H.B. No. 86] the General Assembly reinserted language requiring the court to make certain findings before issuing consecutive prison terms, it excised the statutory subsection requiring a trial court to explicitly set forth those findings in imposing its sentence. Former R.C. 2929.19(B)(2)(c) provided: "The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed \* \* \* [i]f it imposes consecutive

sentences under section 2929.14 of the Revised Code * * *." In enacting the latest version of R.C. 2929.19, the General Assembly struck the foregoing provision entirely. R.C. 2929.19(B) now only requires a court to consider the record and other pertinent information before imposing a sentence and to include in its sentencing entry "whether the sentences are to be served concurrently or consecutively." Thus, although the General Assembly has expressed an intent that a trial court impose consecutive sentence [sic] only if it first finds that certain conditions exist, the General Assembly has eliminated the requirement that the court codify those findings in its sentencing entry. *Id.* at ¶ 49.

{¶ 29} Just like the Ninth District in *Just*, both the Twelfth and Eighth Districts have also held that a sentencing court is not required to set forth its consecutive sentence findings in sentencing entries. *State v. Smith*, 12th Dist. Clermont No. CA2012-01-004, 2012-Ohio-4523, ¶ 34; *State v. Young*, 8th Dist. Cuyahoga No. 99483, 2013-Ohio-5425, ¶ 15.

{¶ 30} We agree that Ohio law does not currently require a sentencing court to include consecutive-sentence findings in sentencing entries. Instead, R.C. 2929.19(B)(2) provides that sentencing entries must simply indicate whether multiple sentences are to be served consecutively. In this case, the trial court's sentencing entry indicates that the Appellant must serve his prison sentences consecutively. The record also establishes that the trial court made the necessary findings under R.C. 2929.14(C)(4) at the sentencing hearing to impose consecutive sentences. Accordingly, we find no error.

{¶ 31} We also note that if the Supreme Court determines in *Bonnell* that consecutive-sentence findings must be included in sentencing entries, this case could be resolved by a nunc pro tunc entry that corrects the sentencing entry to include the consecutive-sentencing

findings made by the trial court at the sentencing hearing. This would be appropriate because the entry would "reflect what the trial court did decide but recorded improperly." *State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705, 940 N.E.2d 924, ¶ 15.

**{¶ 32}** Slaughter's First Assignment of Error is overruled.

### III. Is a Felony Murder Conviction Based on the Predicate Offense of Felonious Assault Constitutional?

**{¶ 33}** Slaughter's Second Assignment of Error is as follows:

THE TRIAL COURT VIOLATED LEVI SLAUGHTER'S CONSTITUTIONAL RIGHTS AND ERRED WHEN IT FOUND HIM GUILTY OF FELONY MURDER WITH FELONIOUS ASSAULT AS THE PREDICATE OFFENSE. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I, OHIO CONSTITUTION; R.C. 2903.02(B).

**{¶ 34}** Under this assignment of error, Slaughter argues that his conviction for felony murder with the predicate offense of felonious assault is unconstitutional, because it violates the independent-felony/merger doctrine.

**{¶ 35}** Ohio's felony murder statute, R.C. 2903.02(B), states that: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." Therefore, in order to convict a defendant of felony murder, the State is not required to prove that the defendant had an intent to kill, but instead must prove that the defendant intended to commit the underlying felony that proximately caused the victim's death. *State v. Mays*, 2d Dist.

Montgomery No. 24168, 2012-Ohio-838, ¶ 6.

**{¶ 36}** In response to widespread criticism concerning felony murder's intent requirement, many jurisdictions have developed ways to confine the application of the offense. *Id.* at ¶ 7-8. For example, other jurisdictions utilize the independent-felony/merger doctrine, which " 'precludes certain particularly dangerous felonies–the archetype is assault with a deadly weapon–from qualifying [as the underlying felony].' " *Id.* at ¶ 8, quoting Tomkovicz, *The Endurance of the Felony–Murder Rule: A Study of the Forces that Shape Our Criminal Law*, 51 Wash. & Lee L.Rev. 1429, 1467 (1994). In other words, the independent-felony/merger doctrine is a limitation that requires " 'the underlying felony be independent of the killing.' " *Id*., quoting *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002 WL 191582, *4 (Feb. 8, 2002). (Other citation omitted.) Accordingly, "a felonious assault that is an integral element of the homicide cannot be the predicate felony to support the felony murder." (Footnote omitted.) *Id.* at ¶ 10.

**{¶ 37}** However, in *Mays*, we concluded that Ohio does not recognize the independent-felony/merger doctrine. *Id.* at ¶ 13. The General Assembly's adoption of R.C. 2903.02(B) evidenced " 'a clear legislative intent to subject those who commit the most serious felonies to liability for murder, where commission of those felonies results in death.' " *Id*. at ¶ 10, quoting *State v. Cherry*, 9th Dist. Summit No. 20771, 2002-Ohio-3738, ¶ 43. Therefore, " 'in adopting R.C. 2903.02(B) the General Assembly rejected the independent felony/merger doctrine.' " *Id., quoting Cherry* at ¶ 27.

**{¶ 38}** We also noted in *Mays* that Ohio courts have consistently held that the absence of the independent-felony/merger limitation is not unconstitutional. *Mays*, 2d Dist. Montgomery No. 24168, 2012-Ohio-838 at ¶ 12, citing *Cherry* at ¶ 31; *State v. Smathers*, 9th Dist. Summit No. 19945, 2000 WL 1859836, *2-3 (Dec. 20, 2000); *State v. Pickett*, 1st Dist. Hamilton No.

C-000424, 2001 WL 1591318, *3 (Dec. 14, 2001); *State v. Hayden*, 11th Dist. Lake No. 99-L-037, 2000 WL 973413, *4 (July 14, 2000).

{¶ 39}  Slaughter has asked that we reconsider our decision in *Mays*; however, we decline to change our position on the matter.   Following *Mays*, we find no error with respect to Slaughter's felony murder conviction.

{¶ 40}  Slaughter's Second Assignment of Error is overruled.

### IV. Did the Trial Court Abuse Its Discretion in Calling
### Dominique McCoy as a Witness of the Court?

{¶ 41}  Slaughter's Third Assignment of Error is as follows:

THE TRIAL COURT VIOLATED LEVI SLAUGHTER'S DUE PROCESS RIGHTS AND ABUSED ITS DISCRETION WHEN IT DECLARED A STATE'S WITNESS ITS OWN SOLELY FOR THE PURPOSE OF IMPEACHING HER THROUGH PRIOR INCONSISTENT STATEMENTS WITHOUT A SHOWING OF SURPRISE OR AFFIRMATIVE DAMAGE TO THE STATE.   FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I, OHIO CONSTITUTION, EVID.R. 614; EVID.R. 607(A).

{¶ 42}  Under this assignment of error, Slaughter contends that the trial court abused its discretion in calling Dominique, Slaughter's girlfriend, as the court's witness solely for impeachment purposes and without showing surprise or affirmative damage to the State.

{¶ 43}  Pursuant to Evid.R. 614(A), "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus

called."   "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness."   *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 44 (2d Dist.), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 22, 514 N.E.2d 394 (1987).

**{¶ 44}**   "The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify."   *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 23, citing *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18. " 'A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A).' "   *Id*., quoting *Curry* at ¶ 18.   (Other citations omitted.)   "The prime candidate is a victim and an eyewitness who will not otherwise cooperate with the party originally planning to call him."   *Id*., citing *Curry* at ¶ 18.

**{¶ 45}**   We review a trial court's decision to call a witness under Evid.R. 614(A) for an abuse of discretion.   (Citations omitted.)   *Id*. at ¶ 24.   A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable.   *Id*., citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 46}**   " 'It is well-established that a trial court does not abuse its discretion in calling a witness as a court's witness when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement made to police.' "   *Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218 at ¶ 44 , quoting *State v. Schultz*, 11th Dist. Lake No. 2003-L-156, 2005-Ohio-345, ¶ 29; *State v. Lather*, 171 Ohio App.3d 708, 2007-Ohio-2399, 872 N.E.2d 991, ¶ 3 (6th Dist.).

**{¶ 47}**   In this case, Dominique is a prime candidate for being called as a witness of the

court under Evid.R. 614(A). Her testimony was beneficial to ascertaining the truth in this matter, because she was an eyewitness and she was with Slaughter before, during, and after Byrd's death. Dominique also made statements to detectives which implicated Slaughter in the crime. Prior to trial, she made it clear to the State that she was aligned with Slaughter and that she did not want to testify against him. Given that her testimony was important to the determination of the case, and that there was an indication that she would align herself with Slaughter and contradict prior statements, it was not an abuse of discretion for the trial court to call her as the court's witness under Evid.R. 614(A).

{¶ 48} Slaughter cites our decision in *State v. Cleary*, 2d Dist. Montgomery No. 24217, 2011-Ohio-3725, ¶ 85, citing *Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379 at ¶ 45. We stated, " * * * it is error to declare an individual a court's witness, solely for the purpose of allowing the party calling that witness to impeach the credibility of its own witness by means of a prior inconsistent statement."

{¶ 49} However, that quotation from *State v. Cleary* was not only dicta but also an incorrect statement of law. In *Cleary*, this court determined that the appellant did not object to the State's request to declare a recalcitrant witness a court's witness. Therefore, only plain error concerning the issue was under review. This court found none, meaning that it was unable to conclude that the result would have been any different. Accordingly, the quoted sentence from *Cleary* was purely dicta and unnecessary for the result reached.

{¶ 50} More importantly, in our view, the quoted sentence is an incorrect statement of law. Purportedly, *Cleary* cites *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218 (2d Dist.), in support of the quoted proposition. However, what *Arnold* actually said about the court calling a witness is that it should not be allowed when done as "a mere subterfuge

to get evidence before the jury which is not otherwise admissible." *Id.* at ¶ 45, quoting 53 A.L.R. Fed. at 500-501. The *Arnold* decision goes on to say "[t]he fact that evidence offered for impeachment would otherwise be inadmissible does not necessarily portray a subterfuge, however. " *Id.* It is apparent *Arnold* does not say what *Cleary* quotes it for, and thus the sentence quoted above from *Cleary* should be ignored.

{¶ 51} Finally, Evid.R. 614, which allows the court to call a witness as its own, is an exception to the limitation imposed by Evid.R. 607(A), regarding the impeachment of witnesses. Evid.R. 614 is therefore not limited to circumstances where impeachment is allowed under Evid.R. 607(A). A witness often can be convinced to correct his or her trial testimony when confronted with a prior inconsistent statement and to adopt the inconsistent statement as the accurate rendition of facts. The goal of a trial is to seek the truth. We should leave it to the sound discretion of the trial court if, when, and why a witness is called by the court. Moreover, the trial court can, and perhaps should, instruct the jury that a prior inconsistent statement tests the credibility of a witness and, except in limited circumstances, is not substantive evidence.

{¶ 52} Slaughter's Third Assignment of Error is overruled.

### V.   Did Appellant Receive Ineffective Assistance of Counsel?

{¶ 53}    Slaughter's Fourth Assignment of Error is as follows:

LEVI SLAUGHTER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.   FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I, OHIO CONSTITUTION.

{¶ 54}    Under this assignment of error, Slaughter argues that he was denied effective

assistance of counsel when his trial counsel failed to waive a jury trial on the weapons under disability charge before the start of trial. As a result of counsel's failure, Slaughter claims that the jury was exposed to prejudicial statements when the trial court recited the weapons under disability charge and referenced his past juvenile adjudication. Slaughter also claims that he was further prejudiced when his counsel made statements regarding the adjudication during voir dire. Under these circumstances, Slaughter contends that it was impossible for him to receive a fair trial.

{¶ 55} We review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.*

{¶ 56} In *State v. Rogers*, 11th Dist. Trumbull No. 2007-T-0003, 2008-Ohio-2757, the Eleventh District discussed the same ineffectiveness issue that Slaughter has raised here. Like Slaughter, the defendant in *Rogers* claimed that his counsel was ineffective in failing to waive a jury trial on his weapons under disability charge as a means to prevent the jury from hearing his criminal history. The Eleventh District rejected this argument, however, by stating the following:

[T]he right to waive jury trial belongs *not to counsel* but to [the defendant] himself.

*See State v. Adams*, 12th Dist. No. CA2006-07-160, 2007-Ohio-2583, at ¶ 74 ("Ultimately, the decision whether or not to waive his right to a jury trial rest[s] with appellant."). In the absence of any evidence that [the defendant] expressed a desire to waive his rights to a jury trial *prior to trial*, we cannot conclude that his counsel was ineffective for failing to assert a right which did not belong to him. *Id.* at ¶ 82.

{¶ 57} In this case, there is nothing in the record indicating that Slaughter wanted to waive a jury trial on the weapons under disability charge prior to trial. In fact, the transcript of proceedings indicates that Slaughter notified his counsel of his decision in the middle of voir dire. As defense counsel stated at trial:

Probably better to talk about it now before we go any further. Mr. Slaughter has raised the issue. I know the court read the charges lodged against him. Mr. Slaughter would like to waive his right to a jury with the specific charge weapons under disability. I don't believe there has been any harm necessarily the court reading the charges at this point to the jury. He would like to waive his right to a jury with respect to the weapons under disability offense and have that tried to the Court specifically. And before I get up and do my voir dire, you know, I would like to present that to the Court at this time. Transcript Vol. I, p. 142, ln.15-25; 143, ln. 1-2.

{¶ 58} Without evidence of Slaughter's desire to waive the jury prior to trial, we cannot find that defense counsel was ineffective in requesting the waiver when he did. In addition, Slaughter has not demonstrated that he was prejudiced by the references to his juvenile adjudication. Defense counsel's statements regarding the adjudication were not prejudicial, but

amelioratory, as counsel simply explained to the jury that it could only consider the adjudication for the purpose of the weapons under disability charge. Furthermore, the State presented substantial evidence against Slaughter, which included testimony from three eyewitnesses; video stills showing Slaughter getting in a car with the victim minutes before the shooting; and an incriminating letter written by Slaughter. Given all the evidence against him, it is unlikely the jury would have decided the case any differently had it not been informed of Slaughter's prior juvenile adjudication.

{¶ 59} Slaughter's Fourth Assignment of Error is overruled.

## VI. Did the Trial Court Err in Failing to Notify Appellant of the Consequences for Failing to Pay Court Costs?

{¶ 60} Slaughter's Fifth Assignment of Error is as follows:

THE TRIAL COURT VIOLATED R.C. 2947.23(A)(1) AND ERRED BY IMPOSING COURT COSTS WITHOUT NOTIFYING LEVI SLAUGHTER THAT FAILURE TO PAY THOSE COSTS MAY RESULT IN THE COURT'S ORDERING HIM TO PERFORM COMMUNITY SERVICE. R.C. 2947.23.

{¶ 61} Under this assignment of error, Slaughter argues that the trial court violated R.C. 2947.23(A)(1) when it failed to notify him that he could be ordered to perform community service if he failed to pay court costs. As a result of the error, Slaughter claims that he cannot be required to perform community service if he does not pay.

{¶ 62} The version of R.C. 2947.23(A)(1) in effect at the time Slaughter was sentenced in May 2012 required the sentencing court to notify the defendant of the consequences for failing to pay court costs at sentencing. *See* former R.C. 2947.23(A)(1). Specifically, the trial court

was required to notify Slaughter of the following:

> (a) If the defendant fails to pay that judgment [for costs] or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in compliance with the approved payment schedule.

> (b) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount. Former R.C. 2947.23(A)(1)(a)-(b).

**{¶ 63}** The transcript of Slaughter's sentencing hearing clearly indicates that the trial court failed to notify Slaughter that he could be required to perform community service if he failed to pay court costs. Therefore, the trial court erred by not instructing him as required by former R.C. 2947.23(A)(1).

**{¶ 64}** The State conceded in its appellate brief to having Slaughter's judgment modified to eliminate any requirement that he be mandated to perform community service in the event he fails to pay court costs. In circumstances similar to Slaughter's, with agreement of the State, we have modified the defendant's sentence to eliminate any possibility that the defendant can be mandated to perform community service in lieu of court costs. *See State v. Veal*, 2d Dist. Montgomery No. 25253, 2013-Ohio-1577, ¶ 20. We therefore modify Slaughter's sentence to remove the possibility that he be required to perform community service should he fail to pay court costs.

{¶ 65}   Slaughter's Fifth Assignment of Error is sustained.


## VII.   Conclusion

{¶ 66}   Having overruled Slaughter's First, Second, Third, and Fourth Assignments of Error, the trial court's judgment with respect to those assignments of error will be affirmed. Furthermore, having sustained Slaughter's Fifth Assignment of Error, we hereby modify the trial court's judgment in accordance with this opinion, and affirm the judgment as modified.


DONOVAN and HALL, JJ., concur.


. . . . . . . . . . . . .


Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Peter Galyardt
Hon. Dennis J. Langer